IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

PHYLLIS GREEN,                          )
                                        )
            Plaintiff,                  )
                                        )
      v.                                )        1:10CV561
                                        )
CAROLYN W. COLVIN,                      )
Acting Commissioner of Social           )
Security,                               )
                                        )
                                        )
            Defendant.                  )

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Plaintiff, Phyllis Green, brought this action pursuant to Sections 205(g) and 1631(c)(3)

of the Social Security Act (the "Act"), as amended (42 U.S.C. §§ 405(g) and 1383(c)(3)), to

obtain review of a final decision of the Commissioner of Social Security denying her claims for

a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental

Security Income ("SSI") under Titles II and XVI of the Act.[1]  The Court has before it the

certified administrative record and cross-motions for judgment.

## I. PROCEDURAL HISTORY

Plaintiff filed applications for a POD, DIB, and SSI on February 23, 2006 alleging a

disability onset date of May 15, 2005.  (Tr. 9, 178-191, 192-210.)[2]  The applications were

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin should be substituted for Michael J. Astrue as Defendant in this suit.  No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Act, 42 U.S.C. § 405(g).
[2] Transcript citations refer to the administrative record.

denied initially and again upon reconsideration. (*Id.* at 118-23, 125-46.) Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ"). (*Id.* at 147.) At the January 4, 2007 hearing were Plaintiff, her attorney, and a vocational expert ("VE"). (*Id.* at 69.) The ALJ determined that Plaintiff was not disabled under the Act. (*Id.* at 99-110.) On March 14, 2008, the Appeals Council granted Plaintiff's request for review and remanded the matter to the ALJ for further proceedings. (*Id.* at 112-115.) The ALJ held a new hearing on September 15, 2008, at which Plaintiff, her attorney, a VE, a hearing assistant, and a medical expert were present. (*Id.* at 37-68.) The ALJ again determined that Plaintiff was not disabled. (*Id.* at 6-19.) On May 27, 2010, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the Commissioner's final decision. (*Id.* at 1-4.)

## II. FACTUAL BACKGROUND

Plaintiff was 46 years old on the alleged disability onset date. (*Id.* at 18.) She had a limited education, was able to communicate in English, and her past relevant work included work as a nurse's aide. (*Id.*)

## III. STANDARD FOR REVIEW

The Commissioner held that Plaintiff was not under a disability within the meaning of the Act. Under 42 U.S.C. § 405(g), the scope of judicial review of the Commissioner's final decision is specific and narrow. *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986). This Court's review of that decision is limited to determining whether there is substantial evidence in the record to support the Commissioner's decision. 42 U.S.C. § 405(g); *Hunter v. Sullivan*, 993 F.2d 31, 34 (4th Cir. 1992); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).

2

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Hunter*, 993 F.2d at 34 (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). It "consists of more than a mere scintilla" "but may be somewhat less than a preponderance." *Id.* (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)).

The Commissioner must make findings of fact and resolve conflicts in the evidence. *Hays*, 907 F.2d at 1456 (citing *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979)). The Court does not conduct a de novo review of the evidence nor of the Commissioner's findings. *Schweiker*, 795 F.2d at 345. In reviewing for substantial evidence, the Court does not undertake to re-weigh conflicting evidence, to make credibility determinations, or to substitute its judgment for that of the Commissioner. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (citing *Hays*, 907 F.2d at 1456). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." *Craig*, 76 F.3d at 589 (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)). The denial of benefits will be reversed only if no reasonable mind could accept the record as adequate to support the determination. *See Richardson*, 402 U.S. at 401. The issue before the Court, therefore, is not whether Plaintiff is disabled, but whether the Commissioner's finding that Plaintiff is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. *See id.*; *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

## IV. THE ALJ'S DISCUSSION

The Social Security Regulations define "disability" for the purpose of obtaining

disability benefits as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment[3] which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. §§ 423(d)(1)(a), 1382c(a)(3)(A). To meet this definition, a claimant must have a severe impairment which makes it impossible to do previous work or any other substantial gainful activity[4] that exists in the national economy. 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

### A. The Five-Step Sequential Analysis

The Commissioner follows a five-step sequential analysis to ascertain whether the claimant is disabled, which is set forth in 20 C.F.R. §§ 404.1520, 416.920. *See Albright v. Comm'r of Soc. Sec. Admin.*, 174 F.3d 473, 475 n.2 (4th Cir. 1999). The ALJ must determine in sequence:

(1) Whether the claimant is engaged in substantial gainful activity (*i.e.*, whether the claimant is working). If so, the claimant is not disabled and the inquiry ends.

(2) Whether the claimant has a severe impairment. If not, then the claimant is not disabled and the inquiry ends.

(3) Whether the impairment meets or equals to medical criteria of 20 C.F.R., Part 404, Subpart P, Appendix 1, which sets forth a list of impairments that warrant a

---

[3] A "physical or mental impairment" is an impairment resulting from "anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423 (d)(3), 1382c(a)(3)(D).
[4] "Substantial gainful activity" is work that (1) involves performing significant or productive physical or mental duties, and (2) is done (or intended) for pay or profit. 20 C.F.R. §§ 404.1510, 416.910.

4

finding of disability without considering vocational criteria.  If so, the claimant *is* disabled and the inquiry is halted.

(4)    Whether the impairment prevents the claimant from performing past relevant work.  If not, the claimant is not disabled and the inquiry is halted.

(5)    Whether the claimant is able to perform any other work considering both her residual functional capacity[5] ("RFC") and her vocational abilities.  If so, the claimant is not disabled.

20 C.F.R. §§ 404.1520, 416.920.

Here, the ALJ first determined that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of May 15, 2005.  (Tr. 11.)  The ALJ next found in step two that Plaintiff had the following severe impairments:  cervical degenerative disc disease, status post anterior cervical discectomy and fusion at C3-C4 and C4-C5; degenerative joint disease, status post right shoulder arthroscopy; hypothyroidism; recurrent urinary tract infections; depression; and anxiety.  (*Id.*)  At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments listed in, or medically equal to, one listed in Appendix 1.  (*Id.* at 12)  At step four, the ALJ determined that Plaintiff could not return to her past relevant work.  (*Id.* at 18.)  At step five, the ALJ determined that considering Plaintiff's age, education, work experience, and RFC, Plaintiff had acquired work skills from

---

[5] "Residual functional capacity" is the most a claimant can do in a work setting despite the physical and mental limitations of her impairment and any related symptom (*e.g.*, pain). *See* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1); *see also Hines v Barnhart*, 453 F.3d 559, 562 (4th Cir. 2006). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory or skin impairments)." *Hall v. Harris*, 658 F.2d 260, 265 (4th Cir. 1981).

past relevant work that were transferable to other occupations with jobs existing in significant numbers in the national economy, such as a cashier II, office helper, and a shipping and receiving weigher.  (*Id.* at 19.)

### B.  Residual Functional Capacity Determination

Prior to step four, the ALJ determined Plaintiff's RFC based on the ALJ's evaluation of the evidence, including Plaintiff's testimony and the findings of treating and examining health care providers.  (*Id.* at 14.)  Based on the evidence as a whole, the ALJ determined that Plaintiff retained the RFC to perform light work.  (*Id.*)  However, Plaintiff would need to alternate between sitting and standing every 30 to 60 minutes; would need to avoid constant overhead reaching with her right upper extremity; and would be limited to performing simple, routine, repetitive tasks ("SRRT's").  (*Id.*)  The ALJ noted too "that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment."  (*Id.* at 17-18.)

### C.  Past Relevant Work

The ALJ found in step four that Plaintiff had past relevant work as a nurse's aide, which is medium, semi-skilled work.  (*Id.* at 18.)  The ALJ found further that Plaintiff was unable to perform work at the medium level of exertional activity and, therefore, was unable to perform her past relevant work.  (*Id.*)  The ALJ found too that Plaintiff had acquired work skills from her past relevant work, but that these skills did not transfer because, as noted, she did not have

6

the RFC for work at the medium level of exertional activity.  (*Id.*)

## D.  Adjustment to Other Work

The claimant bears the initial burden of proving the existence of a disability.   42 U.S.C.

§§ 423(d)(5), 1382c(a)(3)(H)(i); 20 C.F.R. §§ 404.1512, 416.202-03; *Smith v. Califano*, 592 F.2d

1235, 1236 (4th Cir. 1979).   If the claimant has established at step four that she cannot do any

work she has done in the past because of her severe impairments, the burden shifts to the

Commissioner at step five to show that jobs exist in significant numbers in the national

economy which the claimant could perform consistent with her RFC, age, education and past

work experience.   *Hunter*, 993 F.2d at 35; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir.

1980).   The ALJ found that given Plaintiff's age, education, work experience, and RFC, the

Plaintiff had acquired work skills from past relevant work that were transferable to other jobs

existing in significant numbers in the national economy, such as a cashier II, office helper, and

a shipping and receiving weigher.   (Tr. 18-19.)

## V.  ANALYSIS

Plaintiff raises five issues.   First, she contends that the ALJ failed to apply the "special

technique" in assessing her mental impairments.   (Docket Entry 12 at 5.)   Second, Plaintiff

argues that the AJL erred in concluding that she can work as a cashier II, an office helper, and

a shipping and receiving weigher.   (*Id.* at 7.)   Third, Plaintiff contends the ALJ erred by

finding that she had the capacity to do light, unskilled work with a sit/stand option.   (*Id.* at 9.)

Fourth, Plaintiff contends that the ALJ erred in his credibility analysis.   (*Id.* at 10.)   Fifth, she

argues that the ALJ's RFC finding is not supported by substantial evidence.   (*Id.* at 13.)

## I. The ALJ Properly Assessed Plaintiff's Mental Impairments.

Plaintiff faults the ALJ for failing to apply the "special technique" to every stage of the proceedings. (Docket Entry 12 at 5.) Specifically, Plaintiff asserts that the ALJ erred as a matter of law by failing to complete a Psychiatric Review Technique Form ("PRTF") as a prerequisite to making findings regarding her mental impairments. (Id. at 5-7.)

When evaluating the severity of mental impairments, the Social Security Administration implements a "special technique," outlined at 20 C.F.R. §§ 404.1520a and 416.920a. In the first stage of this technique, symptoms, signs, and laboratory findings are evaluated to determine whether a claimant has a medically determinable mental impairment. 20 C.F.R. §§ 404.1520a(b)(1), 416.920a(b)(1).[6] Second, if the ALJ determines that an impairment(s) exists, the ALJ must specify the symptoms, signs, and laboratory findings that substantiate the presence of the impairment(s). Id. §§ 404.1520a(b)(1) and (e), 416.920a(b) and (e). Third, the ALJ then must rate the degree of functional limitation resulting from the impairment(s). Id. §§ 404.1520a(b)(2), 416.920a(b)(2). Functional limitation is rated with respect to four broad areas (activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation). Id. §§ 404.1520a(c)(3),

---

[6] "[S]ymptoms" consist of a claimant's description of her alleged impairment. 20 C.F.R. §§ 404.1528(a), 416.928(a). In contrast, "signs" include "psychological abnormalities which can be observed." Id. §§ 404.1528(b), 416.928(b). In addition, "[p]sychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development, or perception." Id. § 404.1528(b), 416.928(b). "Laboratory findings" include "psychological phenomena which can be shown by the use of medically acceptable laboratory diagnostic techniques." Id. § 404.1528(c), 416.928(c).

416.920a(c)(3).[7]  Furthermore, the special technique requires the Commissioner to fill out a PRTF as follows:

> At the initial and reconsideration levels of the administrative review process, we will complete a standard document to record how we applied the technique. At the administrative law judge hearing and Appeals Council levels (in cases in which the Appeals Council issues a decision), we will document application of the technique in the decision.

*Id.* §§ 404.1520a(e), 416.920a(e).

Fourth, if a mental impairment is "severe," the ALJ will determine if it meets or is equivalent in severity to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Fifth, if a mental impairment is "severe" but does not meet the criteria in the Listings, the ALJ will assess the claimant's RFC. *Id.* §§ 404.1520a(d)(3), 416.920a(d)(3). The ALJ then incorporates the findings derived from the analysis in his decision. *Id.* §§ 404.1520a(e)(4), 416.920a(e)(4).

Here, the ALJ considered the special technique's four broad functional areas. (Tr. 12.) The ALJ first concluded:

> In activities of daily living, the claimant has mild restrictions.

---

[7] The first three areas are rated on a five-point scale:  None, mild, moderate, marked, and extreme. The fourth area is rated on a four-point scale:  None, one or two, three, four or more.  20 C.F.R. §§ 404.1520a(c)(4), 416.920a(c)(4).  A rating of "none" or "mild" in the first three areas, and a rating of "none" in the fourth area will generally lead to a conclusion that the mental impairment is not "severe," unless the evidence indicates otherwise.  *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1).  An impairment or combination of impairments is not severe if it does not "significantly limit [a claimant's] physical or mental ability to do basic work activities."  *Id.* §§ 404.1521(a), 416.921(a).  "Basic work activities" are the abilities and aptitudes necessary to do most jobs, including physical functions such as walking, standing, sitting, lifting, etc.  *Id.* §§ 404.1521(b), 416.921(b).  The Commissioner has explained that "an impairment(s) that is 'not severe' must be a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities."  Social Security Ruling ("SSR") 96–3p, *Considering Allegations of Pain and Other Symptoms in Determining Whether a Medically Determinable Impairment Is Severe.*

9

According to the claimant's testimony, she cannot stand for longer than 15 minutes or sit for longer than 30 minutes. The claimant explained that she can perform some household chores but relies on her children to do what she cannot do. The claimant stated that she can wash dishes, but needs to sit, can fold light clothes, but is unable to vacuum. The claimant testified that her daughters do the cooking and her son the cleaning. The claimant said that she still has a driver's license but only drives two to three days a week since her surgery. With regard to shopping, the claimant explained that her children drive her to the store but that, instead of going in, she gives them a shopping list and waits in the truck while they shop.

(*Id.*) A finding of mild difficulties is supported by substantial evidence in the record. (*See, e.g.,* Tr. 42, 51-53, 467 (3/9/07 "Emotional health (feeling depressed or anxious) did not interfere with her ability to accomplish daily activities during the past four weeks.")

Second, the ALJ concluded that Plaintiff had mild limitations in social functioning. (*Id.* at 12.) The ALJ concluded that:

In social functioning, the claimant has mild difficulties. The claimant testified that she does not leave the house except to attend church every other Sunday and to go to the store and [to] doctor['s] appointment[s]. The claimant also testified that she had difficulty dealing with her teen-age son. On the other hand, the claimant's medical records show that she had a relationship with the same man for over a year; indeed, the medical records document that the claimant began mental health treatment in January 2006 after her break-up with her long-time boyfriend. Her therapist's treatment notes indicated that the claimant's depression improved with medication.

(*Id.* at 13.) A finding of mild difficulties is supported by substantial evidence. (*See, e.g.,* Tr. 44-54, 82, 447 (4/20/06 "[Plaintiff] reports she's doing better. She feels the meds have done a lot for her mood. She is getting out a little more and getting some exercise as well.")

Third, the ALJ concluded further that Plaintiff had mild to moderate difficulties with

10

regard to concentration, persistence, or pace. (*Id.* at 13.) Specifically, the ALJ noted:

> With regard to concentration, persistence or pace, the claimant has mild to moderate difficulties. The claimant testified that she oversleeps and forgets to get her children up and also needs to be reminded to take her medications. The claimant also stated that she sometimes has to ask to have a question that she did not understand repeated. However, when describing her daily activities, the claimant testified that she reads the newspaper and books. The claimant further testified that she watches soap operas on television and is able to follow the story line. The testimony is consistent with treatment notes of her psychiatrist, which, as noted in the prior decision, document that the claimant reported improvement in her mood, sleep, and appetite with therapy and medication and that she has repeatedly been noted to have normal memory functioning, orientation, thought processes and organization, motor activity, attention, and concentration, and language skills.

(*Id.* at 13.) A finding of mild to moderate difficulties is supported by substantial evidence in the record. (*See, e.g.,* Tr. 57-58, 60-62, 394, 398, 404, 406, 408, 415, 447, 709.)

Fourth, regarding decompensation, the ALJ concluded that, "As for episodes of decompensation, the claimant has experienced no episodes of decompensation. The claimant's medical records show that she has never required inpatient treatment for mental health issues although she received weekly outpatient therapy through Caring Family Network beginning in January 2006." (*Id.* at 13.) The ALJ's conclusion is supported by substantial evidence (or rather a lack of evidence as to decompensation) in the record.[8]

---

[8] As Defendant correctly points out (Docket Entry 14 at 5), mental health treatment notes support at most a mild degree of functional limitation due to mental health impairment (GAF score of 65, compared to a GAF score of 45 when first seen in early 2006). (Tr. 611, 615.) The GAF is a scale ranging from zero to one hundred used to rate an individual's psychological, social, and occupational functioning. *See* Am. Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders 32-34 (4th Ed., Text Revision 2000). Scores between 41 and 50 indicate serious symptoms (such as suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (*e.g.,* no friends, unable to keep a job). *Id.* Scores between 51-60

11

The ALJ was not required to make any more specific findings of the claimant's functional limitations.[9] Still, Plaintiff is correct that a PRTF was never completed at the initial or reconsideration stages as required by the regulations. And while the PRTF findings were made and incorporated into the ALJ's decision, a PRTF was never filled out in this case at any stage by a medical consultant. The question, then, is whether the Commissioner's failure to obtain a PRTF at any stage of the proceedings requires remand where the essential findings of a PRTF are made at the hearing stage by the ALJ, are incorporated in the ALJ's decision, and are, as here, supported by substantial evidence.

The undersigned concludes that any error here is essentially harmless for at least three reasons. First, as explained in detail above, the ALJ *did* in essence perform the PRTF analysis in his decision, and these findings are supported by substantial evidence.

Second, in reaching his conclusions, the ALJ *was* aided by the testimony of a medical expert. At the hearing, the ALJ called Dr. Helen Cannon as a medical expert. Dr. Cannon indicated that she read all the medical records provided to her by the ALJ, that they were sufficient to permit her to form an opinion of Plaintiff's medical status, and that, in pertinent part, Plaintiff had a diagnosis of depression and anxiety disorder, which were "well documented" in the record. (Tr. 62-63.) Dr. Cannon opined further that these impairments did not meet or equal the requirements of a listing of impairments. (*Id.* at 63.) When asked

---

indicate moderate symptoms or moderate difficulties in social, occupational, or school functioning. *Id.* Scores between 61 and 70 indicate mild symptoms or some difficulty in social, occupational, or school functioning. *Id.*

[9] *See, e.g., Ehrisman v. Astrue*, 377 Fed. Appx. 917, 919–20 (11th Cir. 2010) ("The ALJ's decision indicates that he appropriately incorporated the PRTF mode of analysis into his findings and conclusions, as required by the Social Security regulations. Accordingly, we find no error." (footnote and citations omitted)).

12

what limitations these impairments placed upon Plaintiff, Dr. Cannon testified that:

> I thought from my review of the record and the record I
> do have, the most she could do would be lift 20 pounds. And I
> think she would do, be able to do SRRTs. I reviewed all of the
> mental health notes which basically are from Caring Family
> Network. And when she does see a psychiatrist overall she's
> actually, he talks about she really has normal attention,
> concentration, language, speech. There is, and he actually thinks
> her depression has improved. So I think that she would be able
> to do 20 pounds. I would also add a sit/stand option, and I
> would also add SRRT because of her various, her various
> complaints. There are no, after her orthopedic, her two
> procedures, there were no, I never found any limitation or any
> type of impairment, a percent impairment put on her. But I
> think that's reasonable with the whole record that I have.

(*Id.* at 64.) Thus, in performing the special technique the ALJ was able to rely, at least in part, on the opinion of a health expert in addition to other evidence, such as Plaintiff's own testimony and progress notes from her physicians. The ALJ clearly gave Plaintiff's mental impairments the serious consideration required by SSA regulations and procedures and in fact, found them severe enough to limit Plaintiff to work involving only SRRT's.

Third, case law in this circuit supports the conclusion that any error here is ultimately harmless. For example, in both *Felton–Miller v. Astrue* and *Kennedy v. Astrue*, the ALJ's failure to secure a PRTF at the initial or reconsideration stage was not deemed to be reversible error, nor did it require remand, where the ALJ later performed the special technique without the aid of a medical consultant and incorporated the results in his decision. *Felton-Miller v. Astrue*, No. 2:10–CV–5–FL, 2010 WL 4809030, *4-8 (E.D.N.C. Oct. 4, 2010) (unpublished) (concluding that "at the ALJ level, the regulations demand only that the special technique be performed, not that the special technique be performed by a medical expert or psychologist"); *Kennedy v.*

13

*Astrue*, No. 5:08–CV–11–FL, 2009 WL 605315, *3 (E.D.N.C. Mar. 9, 2009) (unpublished) ("The regulations demand only that the technique be performed, not that a medical expert or psychologist perform it."). There is one important factual distinction between *Felton-Miller*, *Kennedy*, and this case. In the former cases the Commissioner was not on notice as to any need to obtain a PRTF at the initial or reconsideration stages, because mental impairments were only raised at the hearing stage. Here, Plaintiff argues, and the undersigned assumes, that the Commissioner was on notice that Plaintiff was alleging mental impairments at both earlier stages. Nevertheless, because no prejudice has inured to Plaintiff as a result of this error, the undersigned can see no reason why the Commissioner's failure to obtain a PRTF earlier requires remand here. This is because, as indicated above, the ALJ essentially performed the special technique, which is supported by substantial evidence.

Plaintiff contends that she was prejudiced. She points to the record in support of the following (1) in January 2006, she was diagnosed with major, severe depression with a GAF score of 45, (Tr. 440), (2) in February 2006, she had difficulty sleeping and eating, was depressed, and had frequent crying spells (*id.* at 426), (3) in March 2006, she still had a GAF of 45 and was depressed and crying all the time (*id.* at 423), (4) in April, her condition was essentially the same (*id.* at 417), (5) and in September 2006, she reported an increase in social isolation, unwillingness to leave the house, and anxiety (*id.* at 401). (Docket Entry 12 at 6.) Plaintiff further argues that she was processed through all stages of the claim process without once being evaluated under the special technique, and that, in essence, it was prejudicial error, to permit this to be "cured" by the ALJ, a layman.

14

Yet, as explained above, the special technique was essentially performed at the hearing level by the ALJ, in consultation with a medical expert who opined that Plaintiff's depression had improved, and that far from being disabled, she was capable of employment so long as she was limited to performing SRRT's. Thus, even assuming for the moment that the evidence cited by Plaintiff above demonstrates that she was disabled for a period of time, Plaintiff has not demonstrated that she was disabled for twelve months, especially in light of Dr. Cannon's testimony, amply supported in the record, that Plaintiff's depression improved. This is because at all relevant stages, a claimant must demonstrate that any disability was persistent, causing limitations that remained (or were likely to remain) at a disabling level for at least twelve continuous months. 20 C.F.R. §§ 404.1509, 404.1522, 416.909 and 416.922. Moreover, one of the stated goals of the special technique is to help the agency "[i]dentify the need for additional evidence to determine impairment severity." 20 C.F.R. §§ 404.1520a(a)(1), 416.920a(a)(1). The ALJ discharged any such obligation in this case by consulting Dr. Cannon as a medical expert. Consequently, the undersigned concludes that any error here is ultimately harmless.

## II. The ALJ's Conclusion That There Is Work in the National Economy that Plaintiff Can Perform Is Supported by Substantial Evidence.

At the hearing, the ALJ posed a hypothetical question to the VE containing substantially the same limitations as were included in the ALJ's assessment of plaintiff's RFC. (Tr. 66.) In response, the VE testified that an individual with those limitations—and with the same age, education and work experience as Plaintiff—would be able to perform other jobs, such as a cashier II, office helper, and shipping and receiving weigher. (*Id.* at 66-67.)

15

Based on the testimony of the VE, the ALJ found that Plaintiff would be capable of performing other jobs existing in significant numbers in the national economy, and therefore that she was not disabled at step five. (*Id.* at 18-19.)

Plaintiff faults the ALJ for concluding that she could work as a cashier II, office helper, and shipping and receiving weigher because these positions involve tasks exceeding her limitation to SRRT's. (Docket Entry 12 at 7-9.) Plaintiff contends that such a limitation means that she is limited to working jobs with a reasoning level of one as defined by the Dictionary of Occupational Titles ("DOT") and that the jobs of cashier II, shipping and receiving weigher, and office helper require a reasoning level of two or three. (*Id.* at 7-9.)

Reasoning levels 1 through 3 are defined as follows:

> 03 Level Reasoning Development
>
> Apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form. Deal with problems involving several concrete variables in or from standardized situations.
>
> 02 Level Reasoning Development
>
> Apply commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations.
>
> 01 Level Reasoning Development
>
> Apply commonsense understanding to carry out simple one- or two-step instructions. Deal with standardized situations with occasional or no variables in or from these situations encountered on the job.

U.S. Dept. of Labor, DOT, App. C *available at* 1991 WL 688702. Plaintiff is correct that a

16

cashier II and shipping and receiving weigher are designated as requiring a reasoning level of three (DOT No. 211.462–101, *available at* 1991 WL 671840; DOT No. 222.387–074 *available at* 1991 WL 672108) and the job of office helper requires a reasoning level of two (DOT No. 239.567–010, *available at* 1991 WL 672232).

Plaintiff cites a number of non-binding cases holding that a reasoning level of two is inconsistent with a limitation to only SRRT's. (Docket Entry 12 at 8.) However, the undersigned finds more persuasive the logic underlying those cases holding that a reasoning level of two is not necessarily inconsistent with SRRT's. For example, *Meissl v. Barnhart* addressed whether a person limited to work involving simple and repetitive tasks could perform a job with a reasoning level of two. 403 F. Supp. 2d 981, 984 (C.D. Cal. 2005). The court explained:

> [t]he Social Security regulations separate a claimant's ability to understand and remember things and to concentrate into just two categories: "short and simple instructions" and "detailed" or "complex" instructions. 20 C.F.R. § 416.969a(c)(1)(iii); *see also* 20 C.F.R. part 404, subpart P, Appendix 1, Listing 12.00(C)(3) ("You may be able to sustain attention and persist at simple tasks but may still have difficulty with complicated tasks"). The DOT, on the other hand, employs a much more graduated, measured and finely tuned scale starting from the most mundane ("simple one-or two-step instructions" at level one), moving up to the most complex ("applying principles of logical or scientific thinking . . . apprehend the most abstruse classes of concepts" at level six). To equate the Social Security regulations use of the term "simple" with its use in the DOT would necessarily mean that all jobs with a reasoning level of two or higher are all encapsulated within the regulations' use of the word "detail." Such a "blunderbuss" approach is not in keeping with the finely calibrated nature in which the DOT measures a job's simplicity.
>
> Even more problematic for [claimant's] position is that she ignores the qualifier the DOT places on the term "detailed" as

17

also being "uninvolved." This qualifier certainly calls into question any attempt to equate the Social Security regulations' use of the term "detailed" with the DOT's use of that term in the reasoning levels. Instead of simply seeking to equate the two scales based on the serendipity that they happen to employ the same word choice, a much more careful analysis is required in comparing the claimant's RFC with the DOT's reasoning scale.

*Meissl*, 403 F. Supp. 2d at 984. The court then determined that the claimant's reasoning level was at a level two, rather than a one. *Id.* (citing *Hackett v. Barnhart*, 395 F.3d 1168, 1176 (10th Cir. 2005) (holding that "level-two reasoning appears more consistent with plaintiff's RFC" to "simple and routine tasks")). The *Meissl* court also determined that the ALJ's limitation of claimant to performing simple, routine and repetitive tasks did not conflict with the DOT's level two reasoning requirement. *Meissl*, 403 F. Supp. 2d at 984–85.[10]

Moreover, a number of courts have recently held that there is no *per se* conflict between a job classified at reasoning level *three* and a limitation to simple, routine, unskilled work.[11] In

---

[10] *See also Burnette v. Astrue*, No. 2:08–CV–009–FL, 2009 WL 863372, *5 (E.D.N.C. March 24, 2009) (unpublished) ("The *Meissl* court's approach has found favor with a number of other courts . . . . This court agrees with the magistrate judge and adopts the approach of the *Meissl* court. The ALJ's limitation of plaintiff to 'simple routine repetitive tasks' is not inconsistent with jobs at the DOT reasoning development level 2. Therefore, the magistrate judge correctly found that, because the VE provided one DOT job category on which the ALJ could rely for his finding at step five of the sequential evaluation, any errors made by the VE regarding other jobs suggested were harmless . . . .") (citations omitted).

[11] *See, e.g., Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009) (holding there is no conflict between jobs classified at reasoning level three and a limitation to "simple, unskilled work"); *Hurtado v. Astrue*, No. 09–60930, 2010 WL 1850261, at *11 (S.D. Fla. Apr. 14, 2010) (unpublished) (holding there is no conflict between mail clerk job classified at reasoning level three and limitation to "simple routine tasks," and noting that "[m]ost courts which have addressed this issue have held that the requirement of Reasoning Level 2 or 3 is not inconsistent with the ability to perform only simple tasks, and thus no conflict existed between the VE's job descriptions and the DOT"); *Cottman v. Astrue*, No. BPG–08–1753, 2009 WL 4884506, at *6 n.5 (D. Md. Dec. 9, 2009) (unpublished) ("The ALJ's determination that plaintiff could only perform simple tasks, however, is not necessarily inconsistent with a finding that plaintiff can perform the job of surveillance systems monitor"); *Webb v. Astrue*, No. 4:08–CV–747–Y, 2010 WL 1644898, at * 12 n.10 (N.D. Tex. Mar. 2, 2010) (unpublished) ("A job as a city bus

18

light of the above, it was not error for the ALJ to conclude that Plaintiff could work as an office helper. This job, which requires a reasoning level of two, is compatible with Plaintiff's limitation to performing SSRT's and exists in significant numbers in the state (2,000) and national economy (150,000). (Tr. 67.) Beyond this, the undersigned need not, and does not, definitively address whether Plaintiff's SRRT limitation precludes her from doing the work of a cashier II or shipping and receiving weigher. Substantial evidence supports the ALJ's conclusion that there are positions as an office helper Plaintiff can perform.

### III. Substantial Evidence Supports the ALJ's Conclusion that Plaintiff Has the Capacity to Do Light, Unskilled Work with a Sit/Stand Option.

Plaintiff next points (Docket Entry 12 at 9) to SSR 83-12, which provides that "Unskilled types of jobs are particularly structured so that a person cannot ordinarily sit or stand at will." SSR 83-12, *Capability to Do Other Work—The Medical Vocational Rules as a Framework for Evaluating Exertional Limitations Within a Range of Work or Between Ranges of Work*. Plaintiff contends that this language creates a "rebuttable presumption that unskilled jobs which accommodate a sit/stand option do not exist in significant numbers in the national economy" and in support cites *Manes v. Astrue*, 267 Fed. Appx. 586, 588 (9th Cir. 2008). Given that the job of an office helper is unskilled work, Plaintiff argues that a presumption existed in this case that the number of office helper jobs in the economy was not significant

driver that requires a [reasoning level] of three is not necessarily inconsistent with an RFC that includes only the ability to perform simple, routine work tasks"); *Robinson v. Astrue*, No. 4:08CV 1980MLM, 2010 WL 481045, at *18 (E.D. Mo. Feb 4, 2010) (unpublished) ("reasoning level three is consistent with limitations to simple, repetitive and routine tasks"); *Blanchard v. Astrue*, No. 09–1143–SAC, 2010 WL 2925180, at *11–12 (D. Kan. July 21, 2010) (unpublished) (affirming the Commissioner's decision that claimant could perform reasoning level three jobs despite a limitation to "simple, routine, repetitive work that is as stress free as possible"); *Koontz v. Astrue*, No. 08–2153–LAB (WVG), 2010 WL 3339388, at *8–9 (S.D. Cal. July 26, 2010) (unpublished) ("there is no conflict between simple repetitive work and reasoning levels of 2 and 3").

19

and, thus, as in *Manes*, there was a conflict between the VE's testimony and the DOT. Citing SSR 00-4p, *Use of Vocational Expert and Vocational Specialist Evidence, and Other Reliable Occupational Information in Disability Decisions*, Plaintiff rounds out her argument by asserting that the VE erred here by denying that a conflict existed between her testimony and the DOT. (Tr. 66.)[12] This was erroneous under SSR 83-12, Plaintiff contends, because the VE's testimony was speculative and did not overcome the presumption that sit/stand work did not exist in sufficient numbers in the unskilled light category.

In pertinent part, SSR 83-12 provides that:

> In some disability claims, the medical facts lead to an assessment of RFC which is compatible with the performance of either sedentary or light work except that the person must alternate periods of sitting and standing.

> . . . . .

> [M]ost jobs have ongoing work processes which demand that a worker be in a certain place or posture for at least a certain length of time to accomplish a certain task. Unskilled types of jobs are particularly structured so that a person cannot ordinarily sit or stand at will. *In cases of unusual limitation of ability to sit or stand, a [vocational specialist] should be consulted to clarify the implications for*

---

[12] More specifically, SSR 00–4p requires that:

> Occupational evidence provided by a VE or VS generally should be consistent with the occupational information supplied by the DOT. When there is an apparent unresolved conflict between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled. At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency.

*Id.*

*the occupational base.*

SSR 83–12 (emphasis added).

In this case, the ALJ sought the services of a VE as mandated by the language of SSR

83-12 emphasized above. The ALJ asked the VE the following questions:

> Q. I want you to consider a hypothetical individual the same age, education, work background as the claimant, and I want you to also consider the individual to have limitations described here today by Dr. Cannon such as the individual would be limited to the performance of light work; that would require that alternate, the ability to alternatively sit/stand every 30 to 60 minutes; needs to avoid constant, what she said, overhead reaching with the, on the right; and would be limited to the performance of simple, routine, repetitive tasks. And I believe needs to avoid any job where there's that constant looking down is what's described.
>
> A. Okay.
>
> Q. With those limitations, would there be any jobs you could suggest such an individual could perform?
>
> A. One would be able to perform jobs such as cashier II, 211.462-010, 3,000 in North Carolina, 250,000 nationally. Office helper, 239.567-010, 2,000 in North Carolina, 150,000 nationally. Shipping and receiving weigher, 222.387-074, 1,000 in North Carolina, 55,000 nationally.
>
> . . . .
>
> Q. Any conflict between your testimony at this hearing and the Dictionary of Occupational Titles?
>
> A. Not to the best of my knowledge.

(Tr. 66-67.)

Here, as demonstrated above, the ALJ discharged his obligation under SSR 83-12 to

consult the services of a VE when confronted with a claimant demonstrating an "unusual

21

limitation of ability to sit or stand." The VE testified that there were jobs in the local and national economy that a claimant like Plaintiff could perform despite those limitations and testified further that her testimony was consistent with the DOT. The ALJ was entitled to rely upon this testimony and it provides substantial evidence for the ALJ's conclusion that there are jobs in the national economy Plaintiff can perform.

Additionally, *Manes* is inapposite. In *Manes*, the VE found that the claimant could perform the job of parking lot attendant (classified by the DOT as light), despite the fact that he had an RFC for sedentary work with a sit/stand option. *Manes*, 267 Fed. Appx. at 588. Thus, there was an obvious conflict between the VE's testimony and the DOT's classification of the parking lot attendant position. Here, however, the DOT identified the positions of cashier II (DOT No. 211.462–101, *available at* 1991 WL 671840), office helper (DOT No. 239.567–010, *available at* 1991 WL 672232), and shipping and receiving weigher (DOT No. 222.387–074 *available at* 1991 WL 672108) at the light exertional level, which is consistent with Plaintiff's RFC, as did the VE who referenced these positions in response to the ALJ's hypothetical.

Moreover, the DOT is silent as to the availability of a sit/stand option for these particular positions. As such, it was proper for the ALJ to obtain and consider VE testimony in order to supplement the DOT job descriptions. *See Lusk v. Astrue*, No. 1:11–cv–00196– MR, 2013 WL 498797, at *5 (W.D.N.C. Feb. 11, 2013) (unpublished) (citing *Hynes v. Barnhart*, No. Civ. 04CV490SM, 2005 WL 1458747, at *5 (D.N.H. June 15, 2005) (unpublished)). The VE was qualified to determine which jobs an individual with Plaintiff's RFC could perform,

22

and the ALJ properly relied on the VE's testimony to find Plaintiff could perform other work that existed in significant numbers in the national economy. *See id.* (citing *Moffett v. Apfel*, No. Civ. A. 99–0915–P–S, 2000 WL 1367991, at *8 (S.D. Ala. Sep. 1, 2000) (unpublished)).

## IV.     The ALJ Properly Applied *Craig v. Chater.*

Plaintiff next contends that the ALJ erred in his credibility analysis.    (Docket Entry 12 at 10-13.)       The Fourth Circuit Court of Appeals has adopted a two-step process by which the ALJ must evaluate a claimant's symptoms.    The first step requires the ALJ to determine if the plaintiff's medically documented impairments could reasonably be expected to cause plaintiff's alleged symptoms. *Craig,* 76 F.3d at 594.   The second step includes an evaluation of subjective evidence, considering claimant's "statements about the intensity, persistence, and limiting effects of [claimant's] symptoms." *Id.* at 595 (citing 20 C.F.R. §§ 416.929(c)(4) and 404.1529(c)(4).)   "The ALJ must consider the following: (1) a claimant's testimony and other statements concerning pain or other subjective complaints; (2) claimant's medical history and laboratory findings; (3) any objective medical evidence of pain; and (4) any other evidence relevant to the severity of the impairment." *Grubby,* No. 1:09cv364, 2010 WL 5553677, at *3 (W.D.N.C. Nov. 18, 2010) (unpublished) (citing *Craig,* 76 F.3d at 595; 20 C.F.R. § 404.1529(c)). "Other evidence" refers to factors such as claimant's daily activities, duration and frequency of pain, treatment other than medication received for relief of symptoms, and any other measures used to relieve claimant's alleged pain. *Id.* Moreover, SSR 96-8p requires that:

> The adjudicator must consider all allegations of physical and mental limitations or restrictions and make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC. Careful consideration must be given to any available information about symptoms because subjective descriptions

23

> may indicate more severe limitations or restrictions than can be
> shown by objective medical evidence alone.

SSR 96-8p, *Assessing Residual Functional Capacity in Initial Claims.* Similarly, in determining the credibility of a claimant, SSR 96–7p, *Assessing the Credibility of an Individual's Statements*, instructs the ALJ to "consider the entire case record" and requires a credibility determination to "contain specific reasons for the finding on credibility, supported by the evidence in the case record[.]" SSR 96–7p. An ALJ's credibility finding is entitled to "substantial deference." *Sayre v. Chater*, No. 95-3080, 1997 WL 232305, at *1 (4th Cir. May 8, 1997) (unpublished).

Here, the ALJ performed both steps of the analysis. The ALJ recited at length Plaintiff's testimony, including testimony recounting her alleged symptoms and limitations, and then discussed at length medical evidence related to Plaintiff's (1) cervical degenerative disc disease, (2) degenerative joint disease, (3) hypothyroidism, (4) recurrent urinary tract infections, and (5) depression and anxiety. (Tr. 15-18.) The ALJ then concluded that the "claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms," thereby completing the first step of the *Craig* analysis. (Tr. 17.) The ALJ then completed the second step of the *Craig* analysis, concluding that Plaintiff's statements regarding "intensity, persistence, and limiting effects of [her] symptoms [were] not credible to the extent they are inconsistent with" her RFC. (*Id.* at 17-18.) The ALJ went on further to note that Plaintiff's "testimony, as described above, is simply inconsistent with the medical evidence of record as well as the testimony of the medical expert." (*Id.*)

Plaintiff does not point to specific evidence that she contends the ALJ mishandled during this analysis, but rather contends that the ALJ failed to accurately understand and apply

24

the *Craig* analysis, particularly at the second step. For example, Plaintiff contends that the ALJ rejected her complaints of pain solely because of a lack of objective medical evidence of the same. (Docket Entry 12 at 12.) However, the ALJ did not discount Plaintiff's complaints of pain *solely* because of a lack of objective medical evidence. Rather, one reason the ALJ discounted Plaintiff's complaints in part was because the medical evidence of record *contradicted* Plaintiff's allegations. (Tr. 18 "The claimant's testimony . . . is simply *inconsistent* with the medical evidence of record as well as the testimony of the medical expert.") (emphasis added)) *See also Craig*, 76 F.3d at 595 ("[C]laimant's allegations about her pain may not be discredited *solely* because they are not substantiated by objective evidence of the pain itself . . . .") (emphasis added). "[T]he only analysis which *Craig* prohibits is one in which the ALJ rejects allegations of pain solely because the pain itself is not supported by objective medical evidence." *Grubby*, 2010 WL 553677, at *10 (citation omitted). And, as Defendant points out (Document 14 at 7), the fact that a claimant meets the threshold burden of showing she has a condition that could be expected to cause complaints like those she claims does not create a presumption that she has disabling pain. *See Felton–Miller v. Astrue*, No. 2:10–CV–5–FL, 2010 WL 4809028 at *6 (E.D.N.C. Nov. 17, 2010) (unpublished).

In this case the ALJ's thorough discussion of the medical evidence, and the testimony of Dr. Cannon, as it relates to Plaintiff's impairments, is supported by substantial evidence. By way of example, substantial evidence indicates Plaintiff was recovering well from surgery for her cervical degenerative disc disease. (*See, e.g.*, Tr. 596-99, 640.) Likewise, as discussed below, Plaintiff's degenerative joint disease in her right shoulder was treated through surgery

and other means and also showed improvement. Plaintiff's medication was successful in treating her hypothyroidism and she was prescribed no limitations by her physicians. (*Id.* at 299, 310, 363, 485, 512.) Plaintiff's urinary tract infections were treated repeatedly. (*Id.* at 303, 307-09, 486, 492, 495, 684-85.) And, last, as discussed above, Plaintiff's mental health improved significantly over time. In sum, substantial evidence supports the ALJ's conclusion that Plaintiff was not completely disabled due to the severity of her pain.

## V. The ALJ's RFC Is Supported by Substantial Evidence.

Plaintiff next argues that the ALJ's RFC limitation that Plaintiff "cannot reach overhead constantly" with her right upper extremity was unsupported by substantial evidence and that the ALJ should have instead found a more restrictive limitation on Plaintiff's ability to reach overhead. (Docket Entry 12 at 13-15.) This argument lacks merit. Dr. Cannon testified that Plaintiff's only limitation with her right upper extremity was that she not "reach overhead constantly." Specifically, at the last hearing the following exchange took place:

> Q. The prior Administrative Law Judge has some limitations on use of the right upper extremity. Would you have any limitations on handling, fingering, reaching or any of those things?
>
> A. Was that prior to her arthroscopic surgery?
>
> Q. Well, the prior Administrative Law Judge in his decision.
>
> A. See, she had the –
>
> Q. He issued that on May 14, '07 and he had limitations on use of the right upper extremity.
>
> A. Well she had her surgery and right, her right shoulder arthroscopic surgery in '06. Overall I thought she had, there was improvement with that. I think that could be reasonable in

26

someone that's had a right impingement syndrome. I don't
have, again, there wasn't anything from her orthopedic surgeon
that she had limitations with that. The best thing actually
following shoulder arthroscopic surgery is movement because
you don't want it to freeze down again, and that's why the PT is
so important with that. So I'm not entirely clear why he said that
except that she obviously, before she had the surgery, that would
have been a limitation. So I would then continue with that
limitation. That would be medically reasonable.

Q. So it would be, but what degree of limitation?

A. Just not constant, right, overhead.

Q. Okay . . . .

(Tr. 63-65.) Dr. Cannon's testimony provides substantial evidence for the ALJ's conclusion

that the only limitation on Plaintiff's ability to reach overhead is that it not be constant.

Plaintiff disagrees, pointing out that in reaching this conclusion the ALJ rejected[13] the

opinion of a non-examining State agency physician who found in May 2006 that Plaintiff could

do medium work and only occasional reaching. (Docket Entry 12 at 13 citing Tr. 327, 334.)

Plaintiff notes further that the ALJ who initially heard this case prior to remand found that

Plaintiff could do no frequent reaching, handling, and fingering and no overhead reaching with

the right upper extremity. (*Id.* citing 105.) Plaintiff also asserts that in the testimony cited

---

[13] Specifically, the ALJ concluded:

> The [RFC] statement . . . is supported by Dr. Cannon's expert medical
> opinion. The undersigned gives substantial weight to Dr. Cannon's
> opinion as well as the opinions of the claimant's treating physicians, as
> reflected in the claimant's medical reports. The undersigned gives
> lesser weight to the medical opinions of the State agency physicians as
> opinions of non-examining sources. Furthermore, the record
> contains additional evidence that was not available to the State agency
> physicians.

(Tr. 18.)

above Dr. Cannon "did not mention any [right upper extremity] limitation on her own, but rather, the ALJ led her to one," that Dr. Cannon's answer was "confusing," and that when Dr. Cannon stated that she "would then continue with *that limitation*" (emphasis added) she was referencing the prior ALJ's conclusion that there be no overhead reaching. (Docket Entry 12 at 13.) Plaintiff construes Dr. Cannon's testimony as veering in moments from no limitation, to a complete limitation against overhead reaching, and then to a limitation of no constant overhead reaching. (*Id.*) Plaintiff asserts that the ALJ's failure to notice these purported conflicts and resolve them was reversible error. (*Id.*)

The undersigned is not convinced. As demonstrated above, the ALJ asked Dr. Cannon what degree of limitation was present in Plaintiff's right upper extremity and Dr. Cannon answered that Plaintiff was prohibited from constant overhead reaching. (Tr. 64.) The ALJ was entitled to rely on this evidence as well as other evidence in the record demonstrating that Plaintiff's right shoulder problem improved after her surgery. (*Id.* at 453, 468-69, 485-88, 492, 504, 710.) The ALJ incorporated the proposed limitation into his hypothetical to the VE, who testified in turn that a hypothetical claimant with such limitations could perform other work in the state and national economy. (*Id.* at 66-67.)

Moreover, at the prior hearing, the VE testified that the occupation of office helper could be done even where a worker could do no overhead reaching or handling with the right arm, upper extremity. (Tr. 92.) Thus, even assuming Dr. Cannon's testimony is too muddled and self-contradictory to prove reliable (a conclusion the undersigned does not reach), there is still substantial evidence in the record to support the ALJ's conclusion that

28

Plaintiff can work as an office helper.  (*Id.* at 67.)

## VI. CONCLUSION

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision is supported by substantial evidence.  Accordingly, this Court **RECOMMENDS** that Plaintiff's Motion for Judgment on the Pleadings (Docket Entry 11) be **DENIED**, Defendant's Motion for Judgment on the Pleadings (Docket Entry 13) be **GRANTED** and the final decision of the Commissioner be upheld.

Joe L. Webster
United States Magistrate Judge

Durham, North Carolina
June 24, 2013